Haynes, J.
A petition is tiled in the court of common pleas setting up an oil lease, claiming that the plaintiff is entitled to an injunction against certain alleged acts of defendant company, which consisted in sinking certain wells upon the premises. To that a demurrer was interposed, and upon the hearing in the court of common pleas, the demurrer was sustained. The plaintiff, not desiring to plead further at that time, a judgment was rendered against him dismissing petition, and for costs. To that judgment an appeal was taken to this court, the case was heard upon the demurrer to the petition in this court, and an opinion was rendered by the court at (he time in overruling the demurrer, and defendant asked leave to file an answer; an answer was filed, and to that a reply was filed, and the case has been heard upon the evidence, and is now before us for our decision.
The lease that was made between the parties was dated on the 26th of May, 1892. It was a grant by the plaintiff *520 herein to the defendant. The Ohio Oil Company, of all the oil and gas in.and under the following described premises: “about one hundred acres of land owned by the plaintiff, lying in Woodville township, this county.” There was a condition in regard to gas that is not in question, for no gas has been found; there was a provision that no well should be drilled nearer than five hundred feet from the house or barn on said premises, and no well should occupy more than one acre. Further provision was, if no well was completed within three months from date, this grant shall become null and void.
The record .and evidence[discloses that the necessary wells were sunk to avoid that condition. There was further, condition that the first parties should receive $100.00 for each well drilled on said premises as[soon as the well was located; all wells to be completed on said land eighteen months from date, and no well to occupy more than one acre of ground. The petition avers that at the time this petition was filed, which was in April, 1895, the defendant company had already sunk five wells,[and[was about to sink another well upon the premises, andjhe prayed that it might be enjoined. The petition proceeded[upon[theyLtheory that this clause I have read, that no welFshall occupy more than one acre of land was, in fact, an affirmative provision, or at least-was construed into an agreementthat there should be a well upon each acre of ground of the one hundred acres, in order to develop the landjproperly,[and] that because defendant had not proceeded within¡eighteen months to sink one well upon each acre, therefore, plaintiff had the • right to consider the lease, as to ninetyffive acres of land, forfeited, and null and void. We decided the demurrer,® and decided against the view that was taken by[the[[parties, and it was stated upon the trial in this case by associate counsel that they, make no claim upon that ground. The answer discloses,[among other things, after denials of allegations, to th¿[petition", *521 that the defendant admits it is claiming a right to drill'and complete other wells, and before the commencement' of this action it was making preparations to drill other wells upon said premises, and had commenced the erection of a derrick ■for that purpose, with the consent and approval of plaintiff, and would, had it not been prevented by the order of the court herein, have drilled and completed other wells thereon and operated the same, if producing wells, paying plaintiff >one-sixth of the oil produced therefrom. The reply denied ithat the plaintiff ever in any manner or form approved of the putting down of additional wells on said premises, and the testimony was taken on this point, the point at issue between them.
Defendant for the affirmative produced two witnesses, and plaintiff, on his part, produced himself, his wife and son, giving testimony in opposition to that given by defendant’s witnesses. On behalf of the Oil Company, its general agent for this territory, Mr. Gordon, gave testimony that in November, 1894, the plaintiff came to him where he was at work upon some premises adjoining the premises of plaintiff, and said to him he would like to have other wells drilled upon the premises. The following testimony was given:
Mr. Baldwin seemed anxious he should have more wells.
“Q. State what was said? A; He was anxious to have more wells drilled; I told him when spring opened we would •drill more wells., ' „
“Q. Was that all that was said and done at that time? A. There was other conversation.
*“Q. I want the whole conversation? A. He said: I want my farm drilled up; if you don’t I will have some one else drill it. We said: In the spring we will come and drill it up. He said, very well, and that was the substance of the conversation.
Witness further stated that in the spring he sent •to an employe, Mr. Reed, the location of the wells, and ^sked him to call upon plaintiff and notify him. By the *522 terms of the contract plaintiff was to have the location of the first two wells; after that, we suppose, defendant was to locate the wells himself; at least the contract is silent upon that subject. The point where the well was to be located was two hundred feet from the Herman well north, on the Herman farm, two hundred feet from the east line of another farm; I have forgotten the name.
Mr. Reed testifies he went to see plaintiff, and says, “I told him I had been instructed to see him by Mr. Gordon, in regard to the building of the rig, and they gave permission.
“Q. State what you said to him; state conversation? A. I told him I had instructi'ons to see him in regard to the building of the rig, and he said he was satisfied to the building of the rig, but would like to make arrangemnts to get gas from one of the wells, and also wanted to lease the rest of his farm. I told him Mr. Gordon would be back in a few days; would be back and see about leasing the other farm.
“Q. State whether you informed him as to whether or not any location had been made, and if so, where you proposed to drill? A. I told him where the location was.
“Q. At this time lumber was hauled within five hundred feet from Baldwin’s house? A. I told Mr. Baldwin that was a mistake made by the teamsters; he objected to the derrick being erected there. I told him it was a mistake, and told him where the derrick was to be, and he said he was satisfied.
‘‘Q. What did you say where it was to be? A. I told him it was two hundred feet from the south line, and two hundred feet from the Herman farm — 30 acres.
“Q. What did he say when you told him? A. He said he was satisfied with the location,and we could build the rig, but before proceeding to drill he would like to see Mr. Gordon, and the rest of the conversation was with regard to the other lease.”
The plaintiff, on his behalf, in testifying says:
‘‘I went up to see Mr. Gordon on other business; he had a well I wanted to see him about putting up lead. He had *523 left it about a year or a little over, and. I went to see when he was going to put it up; I went to see him to tell him I would like to have him come down; would like to lease to him and have him develop the rest of the farm; he said ‘I am going to come,’ but he didn’t'come. I think it was the next week, as near as I can remember,- he said he would be down and fix it up with me. '
‘‘Q. Did you meet him again? A. No, I did not meet him again until I had leased to Mr. McCaskey; before that time I spoke to him in the court house once, and he set a time to come, but did not come. Then, in regard to Mr. Reed, he says, I had no conversation with Mr.' Reed until after I had leased and they were at work on the rig.
”Q. Tell what conversation you had with him then? A. I stopped him; served injunction on him — this suit was commenced.
By Court — “Q. Didn’t have a talk with him until after suit was commenced? A. No, sir; not about this; he had passed the house, and passed the time of day; that was all.”
The wife knew nothing of the matter that had any bearing upon this question, except some conversation with regard to the lumber piled up there. Plaintiff then called his son, who-testified:
”Q. During the springtime,( say in March or April, 1895, do you ever remember meeting Mr.Gordon with your father, or Mr. Reed with your father, on your place, either one of them? A. Reed wasn’t superintendent there at that time; a man by name of Lester was filling Reed’s place at that time.
‘‘Q. Did you meet Mr. Reed? A. He wasn’t in the field that I know of, at that time.
‘‘Q. Did you meet him at all? A. Yes, have met him since then.
‘‘Q.-1895? A. Yes; was in the field then.
‘‘Q. In March or the early days of April, did you ever meet him there? A. Yes, sir.
‘‘Q. What, if any, conversation did you hear between him and your father about this lease and premises? A. I heard him talking; I was there, present, when he came there.
*524 “Q. Where was it? A. At our home, there, on the farm.
“Q. In the house or in the barn? A. Out by the well; and then we went into the house.
”Q. With the old gentleman? A. Yes, sir; and I was with him.
”Q. With reference to the time the lease was made with McCaskey, was this conversation before or after that; before the 13th of April, 1895? A. I can't tell the day of the month he leased to McCaskey.”
”Q. What was that conversation?
By the Court — ‘‘Q. Do you know how long it was before he commenced the injunction he leased to McCaskey? A. He leased to McCaskey, I couldn’t tell you the day of the month; I think in April or May; it was in the spring,
“Q. Do you know how long it was before your father commenced this injunction ? A. Couldn’t tell exactly, but it wasn’t long; it wasn’t, anyway, over a month, I don’t think.
“Q. Do you know anything about a conversation between Mr. Reed and your father in relation to sinking well where derrick was afterwards placed; if so, state it? A. Yes, I do. I heard them in conversation, talking about when he moved that derrick; he asked them to take it away, and they moved it on to another place, and he told them they couldn’t put it down under that lease,
”Q. Who was talking? A. Both talking.
‘‘Q. Name the person talking? A. My father told them they couldn’t put it down under that lease; that he gave Gordon time to come over and make out a new lease with him, but he had never showed up at the time he agreed to, at the time he came back.
“Q. Tell the conversation ? A. Cannot remember it word for word.
“Q. Substance of it? A. He told them they could not put that well down where they moved that rig; not to build any on the lease; that is what he told them.
‘‘Q. That is what your father told Mr. Reed? A. Yes, sir.
“Q. What did Mr. Reed say ? A. Showed a dispatch he got from Mr. Gordon, and told him that was the place to make the location; and I read it myself.
*525 ”Q, What did your father say to that when he showed the dispatch ? A. Said they should never put it down under that lease, for their time was up for drilling.
“Q. What else was said; did he 'say he would not, or would? A. Reed did not say anything to the contrary; talked about one thing or another until he got enough of it, and went away same as anoyne else would that was headed off on 'anything, and that was about-all there was about the matter,”
It seems there was another piece of land owned by plaintiff, and there was talk about leasing that, and so far as the making of a lease has anything to do with the subject matter of conversation, it is claimed on the part of witness for the defendant, that the conversation referred to a lease of the other piece of land. Baldwin claimed that he had the right to have the balance of the farm released. His theory was that defendant company should .occupy five wells with an acre of ground attached to each,and as to the balance of the land he might have a new lease,or should have a new lease; in other words, the land was forfeited, so far as the rights of the lessee in it is concerned. There is some confusion as to the statements of witnesses as ‘ to the conversations, but taking the statement of Baldwin to be true, we are of the opinion that Baldwin had no right to set up the claim he was setting up at that time. Taking the condition of affairs as they existed, this contract of lease was made, and by its terms a well was to be sunk in a certain number of days, another well in two months, and with a further limitation that all wells that were sunk by defendant company should be sunk within eighteen months. There was no provision as to the number of wells the lessee should sink, or in wbat manner the premises should be worked. Some of the questions that are argued before us in this case are questions that have been brought before us frequently, but on some of them we have never passed. It should be remembered that this lease is a conveyance to the oil company of all the *526 oil and gas upon the premises, with the condition as to the time the wells are to be sunk. The defendant, the lessee, was, apparently, on the face of the papers, to proceed and develop the premises according to its own judgment. It has a title to the property to the extent of the lease; has the right to take oil from the premises, and has the right to go upon the premises and sink wells and take the oil; but the method and manner in which it should proceed to do that work, further than' that all wells were to be sunk within eighteen months, is not stated in the contract, and it would seem to be fair and just that the question of the development of the premises should be left largely to the judgment of the party who has possession of the premises. We must remember that the oil under these premises is of a fugitive nature; sometimes it is found, sometimes it is not. The sinking of wells costs quite a large sum of money. The lessee has gone forward and spent the necessary money to sink five wells, and, so far as the record discloses, has paid to plaintiff $100.00 for each well sunk. Has got $500.00 invested in the wells already sunk, besides the cost of them, which is from $1,200 to $2,000.00 each. Whether in its judgment it would be prudent to sink wells upon the other parts of the premises is a matter that must rest largely with it. To say the court shall come in and direct the manner in which it shall work the premises, how many wells shall be sunk, and form a judgment as to the result of sinking these wells, we think, is certainly asking a great deal of a court of equity.
We have never gone so far yet as to adopt a general rule or hold, that the lessee shall work or develop the premises to their fullest capacity. The farthest I think we have gone is to hold that the lessee should proceed to make some use of the property. The party, at the time he made his contract, did not see fit to make any condition in regard to the number of wells, but left it to the lessee to act according to *527 its judgment. We had a case in Wood county where a party had paid $500.00 for leasing a farm, sunk a well, and found no oil, allowed the matter to rest a year or two, and then went on the land, and the owner of the land undertook to declare the premises forfeited, and we decided against him, decided that the party had a right to the time limited for sinking wells to act according to his judgment in the matter. "It turned out that oil afterwards was on the premises. . We have been cited here to the case of Kelley v. The Ohio Oil Co., 9 C.C.511,as laying down the doctrine that a party must proceed to develop the land, perhaps not to its full capacity, but certainly with reasonable activity, and must sink wells. We have read that decision, and probably, if we had the same case before us, we would come to the same conclusion that the circuit court, of Hancock came to; but this case is not that case. In that case the lease had been made of certain premises, and the lessees were to sink what wells they desired to sink within three years, but the defendant proceeded to state that the lessees already owned the lands adjoining to the leased lands, and were sinking wells upon these premises adjoining or opposite wells upon the leased premises, and were drawing oil from the leased premises through their wells upon said adjoining premises already owned by the lessees, and refused to work the leased premises, and it was argued that such action was a fraud upon the rights of the lessor. The court sustained that view of the case. The action was to enjoin new lessees from sinking wells on the leased' premises,and the defendants set up the alleged fraudulent acts of the original lessees, the plaintiffs, and the court held the allegations of fraud gave the court jurisdiction to hear and determine the action, and they held inasmuch as the lessees were doing the acts complained of wrongfully and fraudulently, that they had no standing in a court of equity, therefore, their petition was dismissed. The court, it is true, in its decision, largely cited from Pennsylvania deci *528 sions with which we are familiar, and spoke of a custom in that county that required the lessees to sink off-setting wells, an off-setting well being a well nearly opposite, perhaps directly opposite,wells on the adjoining property, and being sunk for the purpose of taking oil out and also preventing its being drawn out by a well upon adjoining premises. In this case before us there is nothing to show that the premises surrounding these premises were owned by The Ohio Oil Company, no allegations to show any wells being sunk for the purpose of drawing oil from plaintiff’s premises, Application was made for leave to amend the petition, and we thought it no more than our duty to try this case as before us, and not to permit any further amendment.
The complaint of plaintiff is that the company has not sunk more wells on the premises, is not taking out oil as fast as it ought, was not developing the premises as rapidly as plaintiff thought they should be developed; and the main controversy now is whether the plaintiff had given consent to the company to sink the well in question and other wells on the premises. Plaintiff, however, claims that he wanted the company to take a new lease, and then sink wells. The testimony, to say the least, is conflicting upon the points as to whether plaintiff had not given his consent that the company should go forward and sink the well, Taking it upon the testimony of Baldwin himself, the lessee had taken possession of the property, and had proceeded to'sink five wells, and was,in its own manner,taking oil out, The plaintiff’s complaint was that the company was not acting fast enough. Both say the subject was spoken of between them in the fall of 1894. The company was willing to go forward and sink wells, but when it proposed to go forward and sink other wells, plaintiff said, you shall not do it; for the reason that I have a right to the forfeiture of the lease on .these premises, and I will have a new lease. We see no ground of forfeiture whatever. Taking this statement as true, they *529 were seeking to sink these wells which he claims they ought to sink under the lease. He was preventing them from sinking wells because wrongfully setting up a claim of forfeiture. We think, upon the testimony of the case it very clearly appears that this defendant was willing to sink, and was proceeding to sink this well, proceeding with what they supposed to be the. plaintiff’s full and free consent. Plaintiff says himself they had-this conversation, that he wanted them to work the premises. One objection he made was they should make a new lease and’ take it upon different terms. We are of the opinion that the plaintiff has no equity here to enjoin these parties from proceeding to sink this well. We think upon the testimony, fairly considered, that plaintiff did give his consent to the sinking of the wells as claimed by defendant. On this point the testimony of Mr. Gordon is very clear. His testimony shows he was acting upon that conversation, and the further fact is shown, he proceeded to do just what he told plaintiff he would do. He sent lumber and material there, sent a man to locate the well, sent men to erect the derrick, got the foundation erected and derrick part way up, and was stopped by an injunction on behalf of this plaintiff. Tt is true he said to the plaintiff at the time, we have no right to.sink additional wells upon your premises without your consent;, "and that was true because plaintiff had provided that all wells should be sunk within eighteen months, and as soon as he found plaintiff was anxious, and gave his consent, he was willing to have the company proceed with the work. It is argued by counsel that from-tnis statement, Mr. Gordon must have understood that the company’s rights under the lease were forfeited. No such construction can be-drawn from the language or statement by Mr. Gordon. He stated as a fact that the company, under the lease, was not permitted to sink wells after eighteen months. He undoubtedly referred to thé clause as limiting the company’s right.
A. W. Eckert, for plaintiff.
King & Tracy, of counsel.
Bartlett & Wilson, attorneys^for defendant,
We are strongly inclined to the opinion that in the talk in the fall of 1894, about further developing the ninety-five acres, if any lease was spoken of, it was in regard to a lease of lands not included in the lease in question, and that the claim of making a new lease of the ninety-five acres as a condition of sinking more wells on the same was not brought forward or stated until the spring of 1895, and after negotiations had with other parties for the lease of the ninety» five acres.
We think, therefore, from 'the reasons that have been stated, that the petition should be dismissed and the injunction heretofore granted,should be dissolved,and are inclined to think, under the circumstances of the case, that in regard to costs we will allow defendant to pay his own costs in this court, all other costs tó be paid by plaintiff.